195 F.3d 4 (D.C. Cir. 1999)
 American Trucking Associations, Inc., et al.,Petitioners
v.
United States Environmental Protection Agency, Respondent
Commonwealth of Massachusetts, et al., Intervenors
 No. 97-1440 Consolidated with97-1546, 97-1548, 97-1551, 97-1552, 97-1553, 97-1555,97-1559, 97-1561, 97-1562, 97-1565, 97-1567, 97-1571,97-1573, 97-1574, 97-1576, 97-1578, 97-1579, 97-1582,97-1585, 97-1586, 97-1587, 97-1588, 97-1592, 97-1594,97-1596, 97-1597, 97-1598
97-1441
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Filed October 29, 1999
 
 BEFORE: Williams, Ginsburg, and Tatel, Circuit Judges.
 Opinion per curiam on petitions for rehearing.
 Opinion concurring in partial grant of rehearing and dissenting in part from the panel's denial of rehearing filed by Circuit Judge Tatel.
 O R D E R
 Per Curiam
 This matter is before the court for consideration of respondent Environmental Protection Agency's (EPA) petition for panel rehearing in Nos 97-1440 and 97-1441, the responses thereto, and the petitions for panel rehearing of intervenors respondents New Jersey and Massachusetts in Nos. 97-1440 and 97-1441, Citizen for Balanced Transportation, et al. in No. 97-1440, and the American Lung Association in Nos. 97-1440 and 97-1441. Upon consideration of the foregoing, it is
 ORDERED that the petitions of EPA, New Jersey and Massachusetts, and the American Lung Association be granted in part. The court accordingly modifies Parts III.A.2 & .3 and the conclusion of the court's original opinion as set forth in the opinion of the court filed herein this date. It is
 FURTHER ORDERED that the remainder of EPA, New Jersey and Massachusetts, and the American Lung Association's petitions be denied and that Citizen for Balanced Transportation's petition be denied.
 Opinion for the Court filed Per Curiam:
 
 
 1
 The Environmental Protection Agency petitions for rehearing, challenging this court's holdings that: (1) with respect to the factors the agency uses to determine the degree of public health concern associated with different levels of a pollutant, it "appears to have articulated no 'intelligible principle' to channel its application of these factors; nor is one apparent from the statute," American Trucking Ass'ns v. United States Environmental Protection Agency, 175 F.3d 1027, 1034 (D.C. Cir. 1999); (2) "Subpart 2, not Subpart 1, provides the classifications and attainment dates for any areas designated non attainment under a revised primary ozone NAAQS, and the EPA must enforce any revised primary ozone NAAQS under Subpart 2," id. at 1050; and (3) "EPA must consider positive identifiable effects of a pollutant's presence in the ambient air in formulating air quality criteria under 108 and NAAQS under 109," id. at 1052. For the following reasons, we grant the petition for rehearing in part and deny it in part.
 
 I. Delegation
 
 2
 In the EPA's petition for rehearing, counsel for the agency argue that 109 of the Clean Air Act contains the following principle limiting the agency's discretion: "The levels [set in a NAAQS] must be necessary for public health protection: neither more nor less stringent than necessary, but 'requisite.' " EPA Pet. at 8 (emphases in original). Further, counsel claim that in setting the NAAQS at issue in this case the agency applied corollaries of this principle, one for particulate matter, one for ozone,[1] to derive determinate standards.
 
 
 3
 In denying the EPA's petition for rehearing on this issue, we note that the agency previously put forward neither the assertedly intelligible principle its counsel now claim to find in the statute nor the corollaries its counsel now implicitly derive therefrom. To be sure, in the rulemakings that set the NAAQS, the EPA mentioned the corollary propositions its counsel now claim served as intelligible limiting principles, but the agency did not identify eitheras a limit upon its discretion; the EPA never suggested that it could not (or in a later rulemaking would not) base a NAAQS upon evidence that did not meet the 95 percent confidence level or that revealed adverse but transient effects.[2] In its briefs defending the NAAQS, the EPA merely asserted that the Clean Air Act provides an intelligible principle; it failed both to state that principle and to argue that its revised NAAQS were promulgated in accordance with that principle. EPA PM Brief at 145-49; EPA Ozone Brief at 77-80. Indeed, the EPA's briefs in each of these two cases contained the same four sentences assuring the court that the statute provides a principle without explaining what the agency understands that principle to be:
 
 
 4
 [Section] 109(b)(1) requires EPA to promulgate NAAQSbased on air quality criteria issued under 108 that are"requisite to protect the public health" with "an adequatemargin of safety." This language and related legislativehistory provide directions for EPA to follow in settingthe NAAQS. Moreover, EPA has consistently interpret-ed 109(b)(1) to provide further decision making criteriato guide the standard setting process. Thus, the CAA provides a more than sufficient "intelligible principle" to guide EPA's discretion. EPA Ozone Brief at 78; see also EPA PM Brief at 148.
 
 
 5
 These sentences begged the key question about that intelligible principle: "What is it?"
 
 
 6
 As we noted in our first opinion in this case, when "statutory language and an existing agency interpretation involve an unconstitutional delegation of power, but an interpretation without the constitutional weakness is or may be available, our response is not to strike down the statute but to give the agency an opportunity to extract a determinate standard on its own." 175 F.3d at 1038. Counsel for the EPA have now extracted from the statute what they contend is an intelligible principle limiting the EPA's discretion. We express no opinion upon the sufficiency of that principle; only after the EPA itself has applied it in setting a NAAQS can we say whether the principle, in practice, fulfills the purposes of the non delegation doctrine. See Yakus v. United States, 321 U.S. 414, 424-26 (1944); Amalgamated Meat Cutters v. Connally, 337 F. Supp. 737, 759 (D.D.C. 1971) (Leventhal, J., for three judge panel).
 
 
 7
 A final word about our non delegation holding: The Supreme Court has long held that an ambiguous principle in a statute delegating power to an agency can gain "meaningful content from the purpose of the Act, its factual background and the statutory context in which [it] appear[s]." American Power & Light Co. v. SEC, 329 U.S. 90, 104 (1946); see also Federal Radio Comm'n v. Nelson Bros. Bond & Mort. Co., 289 U.S. 266, 285 (1933) (upholding delegation to Federal Radio Commission to grant licenses "as public convenience, interest or necessity requires" in light of "its context [and] the nature of radio transmission and reception"); Fahey v. Mallonee, 332 U.S. 245, 250 (1947) (upholding delegation to the Federal Home Loan Bank Board to promulgate regulations for the appointment of a conservator for savings and loan associations in view of the banking industry's "well defined practices for the appointment of conservators"). This court has done the same. See, e.g., National Ass'n of Broadcasters v. Copyright Royalty Tribunal, 675 F.2d 367, 376 n. 12 (1982) (finding an intelligible principle to guide the tribunal in disbursing cable royalty fees in "specific statements in the legislative history and in the general philosophy of the Act itself"); Amalgamated Meat Cutters, 337 F. Supp. at 747-49 (interpreting the Economic Stabilization Act of 1970 in light of "the historic context of government stabilization measures" in order to "negative a conclusion that the whole program was set adrift without a rudder"). To choose among permissible interpretations of an ambiguous principle, of course, is to make a policy decision, and since Chevron it has been clear that "[t]he responsibilities for assessing the wisdom of such policy choices ... are not judicial ones." Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 866 (1984). Accordingly, just as we must defer to an agency's reasonable interpretation of an ambiguous statutory term, we must defer to an agency's reasonable interpretation of a statute containing only an ambiguous principle by which to guide its exercise of delegated authority. But see Kenneth Culp Davis, A New Approach to Delegation, 36 U. Chi. L. Rev. 713, 713 (1969) (arguing that "judicial inquiries [under the non delegation doctrine] should shift from statutory standards to administrative safeguards").In sum, the approach of the Benzene case, in which the Supreme Court itself identified an intelligible principle in an ambiguous statute, has given way to the approach of Chevron. See Industrial Union Dep't v. American Petroleum Inst. (Benzene), 448 U.S. 607, 642, 646 (1980) (Stevens, J., plurality) (interpreting 3(8) of the Occupational Health and Safety Act to require "a threshold finding ... that significant risks are present," thereby finding in the statute an intelligible principle).[3]
 
 II. Subpart 2 and the Revised Ozone Standard
 
 8
 In its petition for rehearing, the EPA challenges the holdings in Parts III.A.2 and III.A.3 of our original opinion, see 175 F.3d at 1048-51, as well as our jurisdiction to reach those issues. We address the jurisdictional point first.
 
 A. Jurisdiction
 
 9
 The EPA argues that because it has taken no final action implementing the revised NAAQS this court lacks jurisdiction to reach the question whether Subpart 2 prevents the agency from implementing a revised ozone NAAQS under Subpart 1.See 42 U.S.C. 7607(b) (limiting this court's jurisdiction to review of "nationally applicable regulations promulgated, or final agency action taken, by the Administrator"); see also Sierra Club v. Thomas, 828 F.2d 783, 792 (D.C. Cir. 1987).[4]That this claim is raised for the first time in a petition for rehearing does not, of course, alter our obligation to "satisfy [our]self ... of [our] own jurisdiction." Steel Co. v. Citizens for a Better Environment, 118 S. Ct. 1003, 1012-13 (1998).
 
 
 10
 Whether agency action is final for purposes of 7607(b) entails a functional, not a formal, inquiry. See NRDC v. EPA, 22 F.3d 1125, 1132-33 (D.C. Cir. 1994); Ciba-Geigy Corp. v. EPA, 801 F.2d 430, 436 (D.C. Cir. 1986) ("Once the agency publicly articulates an unequivocal position ... and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review"). In this case, "there is nothing tentative about the EPA's interpretation of [Subpart 2]; it is unambiguous and devoid of any suggestion that it might be subject to subsequent revision."Her Majesty the Queen ex rel. Ontario v. EPA, 912 F.2d 1525, 1532 (D.C. Cir. 1990); see also Final Rule: National Ambient Air Quality Standards for Ozone, 62 Fed. Reg. 38,856, 38,885/2 (1997) ("There is no language in sections 181 or 182 that precludes the implementation of a different [ozone] standard under other authority [i.e., Subpart 1];those provisions [i.e., Subpart 2] simply govern the implementation of the 1-hour, 0.12 ppm O3 standard"). Moreover, by promulgating a revised ozone NAAQS the EPA has triggered the provisions of §§ 107(d)(1) and 172, which impose a number of requirements upon the states, the first being that the Governor of each state must determine which areas do not presently comply with the revised NAAQS; those areas that do not comply will ultimately be required to do so. The EPA, therefore, has reached a final decision regarding its power to implement its revised ozone standard, which this court has jurisdiction to review.[5]
 
 
 11
 The EPA also argues that the statements in its preamble regarding implementation are not "ripe for review," a point which it raised in a single sentence in its original brief to this court. EPA Pet. at 19; EPA Ozone Brief at 74. The question whether Subpart 2 prevents the EPA from designating an area as non attainment under its revised ozone standard or from implementing that designation except in conformity with Subpart 2 is a pure question of law, the resolution of which would not benefit from a more concrete setting. As the agency's action is undoubtedly final, the question is fit for review. See Rio Grande Pipeline Co. v. FERC, 178 F.3d 533, 540-41 (D.C. Cir. 1999).
 
 
 12
 B. Subpart 2 and the EPA's Authority to Enforce a Revised Ozone Standard
 
 
 13
 The EPA's arguments in its petition for rehearing do not convince us that we erred in rejecting the EPA's contention that "the reference to 107(d) in 181(a)(1) relates only to designations made under 107(d)(4)," 175 F.3d at 1050, and in holding instead that "s 181(a) clearly encompasses non attainment designations made under all subsections of 107(d)." Id. Indeed, we note that the EPA has abandoned its original position, arguing now that the "most logical reading" of 181(a) is that the reference to 107(d) includes §§ 107(d)(1)(C) and 107(d)(4). EPA Pet. at 24. We find this new reading no more persuasive than the old. As the EPA notes, all five Subparts of the Clean Air Act providing requirements for non attainment areas begin with a reference to 107(d). See 42 U.S.C. §§ 7502(a)(1)(A), 7511(a)(1), 7512(a)(1), 7513(a), 7514(a). It is by no means clear, however, that the references to 107(d) in Subparts 1 and 3 through 5 include only designations made under §§ 107(d)(1)(C) and (d)(4). Not only does the EPA never argue that they are so limited, but on its theory the reference to 107(d) in Subpart 1 also encompasses designations made under 107(d)(1)(A).EPA Pet. at 25. Accordingly, we reject the EPA's new interpretation of 181(a), for it is contrary to "the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." Gustafson v. Alloyd Co., 513 U.S. 561, 570 (1995).
 
 
 14
 Still, the EPA does raise two points relating to Subpart 2 which lead us to grant the EPA's petition for rehearing in part and to make the following revisions to our opinion.
 
 
 15
 The EPA correctly points out that we erroneously treated the attainment dates in the table in Subpart 2 as representing the Congress's judgment about what is "as expeditiously as practicable" in reducing the level of ozone in an area; in fact, those dates represent what the Congress set as outer limits. See 42 U.S.C. 7511(a)(1) ("For each area classified under this subsection, the primary standard attainment date for ozone shall be as expeditiously as practicable but not later than the date provided in table 1"). EPA Pet. at 25 n.35.Accordingly, we grant the EPA's petition for rehearing to the extent of deleting the final three sentences of Part III.A.3, see 175 F.3d at 1051, and substituting for them the following sentence:
 
 
 16
 Therefore, we conclude that Subpart 2 erects no bar to the EPA's requiring compliance with a revised secondary ozone NAAQS "as expeditiously as practicable."
 
 
 17
 The EPA also contends that the conclusion to Part III.A.2, see id. at 1050 ("the EPA must enforce any revised primary ozone NAAQS under Subpart 2"), conflicts with our description of that same conclusion at the end of the opinion, see id. at 1057 (revised ozone NAAQS "cannot be enforced by virtue of [Subpart 2]"). We agree that the two sentences are in tension. To clarify the matter, we grant the EPA's petition for rehearing to the extent of making the following two revisions to our original opinion. First, we replace the final paragraph of Part III.A.2, see id. at 1050, with the following:
 
 
 18
 In sum, because the reference to 107(d) in 181(a)(1)includes the designation of an area as non attainment for ozone under a revised ozone NAAQS, that is, unders 107(d)(1), the EPA can enforce a revised primary ozone NAAQS only in conformity with Subpart 2.
 
 
 19
 Second, we replace the second sentence of the Conclusion, see id. at 1057, with the following:
 
 
 20
 We do not vacate the new ozone standards because the parties have not shown that the standard is likely to engender costly compliance activities in light of our determination that it can be enforced only in conformity with Subpart 2.
 
 
 21
 As with the PM2.5 NAAQS, our decision not to vacate the ozone NAAQS "is without prejudice to the ability of any party to apply for vacatur in the future, should circumstances develop in which the presence of this standard threatens a more imminent harm." American Trucking Ass'ns, Inc. v. EPA, No. 97-1440 (D.C. Cir. Jun. 18, 1999).
 
 III. Beneficent Health Effects
 
 22
 The arguments in the EPA's petition for rehearing give us no reason to doubt the correctness of our conclusion that "all identifiable effects," as used in CAA 108(a)(2), "on its face ... include[s] beneficent effects." 175 F.3d at 1051. Nor do those arguments warrant consideration in a published opinion. We express no opinion, of course, upon the effect, if any, that studies showing the beneficial effects of tropospheric ozone, see id. at 1052, might have upon any ozone standard the EPA may promulgate on remand.
 
 IV. Conclusion
 
 23
 For the above reasons, the EPA's petition for rehearing is
 
 
 24
 Granted in part and denied in part.
 
 
 
 Notes:
 
 
 [1]
 For particulate matter, counsel now state that the EPA's decision was determined by the norm of "the 95 percent confidence level to separate results that could be the product of chance from more convincing evidence of causation." EPA Pet. at 15. For ozone, counsel now state that EPA inferred the existence of effects below 0.08 ppm, but nonetheless concluded that they were "less serious because they are 'transient and reversible.' " EPA Pet. at 16.
 
 
 [2]
 The court's opinion mentioned EPA's observation in the record that effects of ozone concentrations below the standard selected were "transient and reversible," 175 F.3d at 1035, but only in connection with the dissent's suggestion, see id. at 1059, that this was the controlling principle.
 
 
 [3]
 We note that Judge Silberman's dissent from the denial of rehearing en banc turns largely on his dim view of the Court's use of the non-delegation doctrine in Benzene, which he characterizes as "only a makeweight, tossed into the analysis ... to help justify the result." Whatever the merits of Judge Silberman's critique of Benzene, we do not see how a lower court can properly rest its jurisprudence on the rejection of a Supreme Court decision.
 
 
 [4]
 The EPA has yet to designate an area non attainment. Therefore, although the agency does not so argue, if it were correct, then this court would also lack jurisdiction to decide, as it did, that Subpart 2 does not alter the agency's power to designate areas as non attainment under a revised NAAQS. See 175 F.3d at 1047-48.
 
 
 [5]
 The EPA attempts to buttress its jurisdictional argument by reference to 42 U.S.C. 7502(a)(1)(B), which it claims "defers challenges to EPA's implementation decisions classifying areas for setting attainment dates until EPA takes final action on a SIP ... or triggers sanctions ... [after] a state fails to submit a SIP."EPA Pet. at 19. The section to which the EPA refers states as follows: "The Administrator shall publish a notice in the Federal Register announcing each [attainment or non attainment] classification.... Such classification ... shall not be subject to judicial review until the Administrator takes final action under [the statutes the EPA cites in its petition]." That is, the EPA's decision to classify a particular area as attainment or non attainment is not subject to review merely because the EPA published that decision in the Federal Register. Neither this section nor the analogous 7511(a)(3), to which the EPA also cites, prevents a court from deciding, prior to the classification of a particular area, whether the agency has validly promulgated a revised standard.
 Tatel, Circuit Judge, concurring in part and dissenting in part:
 I concur in the partial grant of rehearing with respect to enforcement of the revised ozone standard because, as modified, the opinion now leaves open the possibility that EPA can enforce the new ozone NAAQS without conflicting with Subpart 2's classifications and attainment dates. While I too think that we have jurisdiction to decide the enforcement issue, I write separately because I do not entirely agree with the rationale of the modified panel opinion.
 The panel understood EPA's original position to be that, although Subpart 2 limited the Agency's enforcement of the pre-existing one-hour 0.12 ppm ozone NAAQS, it "has no effect upon the EPA's authority to enforce a revised primary ozone NAAQS." American Trucking Ass'ns v. EPA, 175 F.3d 1027, 1048 ("ATA"). That interpretation, the panel held, not only conflicted with section 7511(a)(1)'s text and legislative history, see id., 175 F.3d at 1048-49, but by leaving the Agency free to "requir[e] areas to comply either more quickly or with a more stringent ozone NAAQS," it defied Congress's clear intent to "extend[ ] the time for non attainment areas to comply with the 0.12 ppm ozone NAAQS." Id. at 1049.
 Having rejected the Agency's interpretation, the panel went on to agree with petitioners that Subpart 2 embodies "a comprehensive enforcement scheme" that "specifically provides classifications and dates for all areas designated non attainment under any ozone NAAQS." Id. at 1049, 1048 (emphasis added). This holding meant that areas not covered by Table 1 in Subpart 2--i.e. those with one-hour ozone design values below 0.121 ppm--were completely exempt from any ozone regulation whatsoever. Although the panel acknowledged that EPA must continue to revise the NAAQS, see id. at 1047, it concluded that the revised standard "cannot be enforced by virtue of [Subpart 2]." Id. at 1057.
 After reading EPA's petition for rehearing and the various responses, I no longer believe that it was "the unambiguously expressed intent of Congress" to command EPA to revise the ozone standards, while denying it the power to enforce them. Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 842. Table 1 specifically provides classifications and attainment dates for some areas, but as EPA points out, "it establishes no attainment dates or classifications for non attainment areas with 'design values' lower than 0.121 ppm." EPA Pet. Reh'g at 22-23. As the Agency argues, it is thus difficult to see how Subpart 2 can "specifically provide[ ]" attainment dates for areas that are designated non attainment under the new standard but are not covered by Table 1. See id. at 22-24. This gap in Table 1 makes it at least ambiguous whether Subpart 2 "specifically provide[s]" classifications and attainment dates for all areas exceeding the revised 0.08 ppm ozone NAAQS.
 EPA also points out that treating Subpart 2 as the exclusive enforcement scheme for all areas leads to "irrational and contradictory consequences." Id. at 23. Subpart 2 provides that "[e]ach area designated non attainment for ozone pursuant to section 7407(d) of this title shall be classified ... under table 1, by operation of law...." 42 U.S.C. 7511(a)(1).Even if the panel is correct that the reference to section 7407(d) includes designations under a revised NAAQS pursuant to section 7407(d)(1)(A), see Slip Op. on Reh'g at 9-10, the fact remains that the only "non attainment areas for which classifications [and attainment dates] are specifically provided under" Table 1 are those having one-hour ozone design values of 0.121 ppm or greater. ATA, 175 F.3d at 1048 (quoting 42 U.S.C. 7502(a)(1)(C), (a)(2)(D)). Classifying other areas "under table 1, by operation of law" is thus impossible or, at the very least, not "unambiguously" "specifically provided for." And although, as the panel noted, "a title [of a statute or section] cannot be allowed to create an ambiguity in the first place," id., at 1050, the ambiguity in this statute--Can section 7511(a)(1) be applied literally to areas that have attained the old standard but fail to meet the new one?-appears in the text of Subpart 2 itself.
 Moreover, EPA has offered a plausible interpretation of the statute that reasonably reconciles the provisions of Sub parts 1 and 2. In its Petition for Rehearing, the Agency states that "Subpart 2 addresses continued non attainment for the primary one-hour ozone standard," EPA Pet. Reh'g at 20, while Subpart 1 provides implementation authority for the new ozone standard in areas that have already attained the old one, see id. at 20-22. The Agency articulated this same reading of the statute in its original brief, stating that "consistent with Congress' intent, EPA interpreted the Subpart 2 provisions to remain in place for areas not attaining the one hour standard, and concluded the one-hour standard should continue to apply until EPA determines that an area attains that standard, thus facilitating continued implementation of the relevant Subpart 2 measures." EPA Ozone Brief at 72.The final rule making--the Agency action we are reviewing here--is even clearer about the relationship between Sub parts 1 and 2:
 [A]t the time of the proposal of the new O3 standard, EPA had proposed an interpretation of the Act in the proposed Interim Implementation Policy (61 FR 65764,December 13, 1996) under which the provisions of sub-part 2 of part D of Title I of the Act would not apply to existing O3 non attainment areas once a new O3 standard becomes effective.
 In light of comments received regarding the interpretation proposed in the Interim Implementation Policy, EPA has reconsidered that interpretation and now believes that the Act should be interpreted such that the provisions of subpart 2 continue to apply to O3 non attainment areas for purposes of achieving attainment of the current 1-hour standard. As a consequence, the provisions of subpart 2, which govern implementation of the1-hour O3 standard in O3 non attainment areas, will continue to apply as a matter of law for so long as an area is not attaining the 1-hour standard. Once an area attains that standard, however, the purpose of the provisions of subpart 2 will have been achieved and those provisions will no longer apply. However, the provisions of subpart1 of part D of Title I of the Act would apply to the implementation of the new 8-hour O3 standards.
 To facilitate the implementation of those provisions and to ensure a smooth transition to the implementation of the new 8-hour standard, the 1-hour standard should remain applicable to areas that are not attaining the1-hour standard. Therefore, the 1-hour standard will remain applicable to an area until EPA determines that it has attained the 1-hour standard, at which point the1-hour standard will no longer apply to that area.
 
 
 [62]
 Fed. Reg. 38,873 (1997), cited in EPA Ozone Brief at 72.See also 40 C.F.R. 50.9(b) (continuing to apply the one-hour 0.12 ppm standard until it is attained)
 To be sure, EPA's original brief did seem to advance the position the panel rejected--that in enforcing the new ozone NAAQS, the Agency is free to disregard altogether Subpart 2's timetable. See EPA Ozone Brief at 69-71. Given the clarity of the final rule, however, I no longer believe that EPA actually intended to argue that it could subvert Subpart 2's schedule in enforcing the new ozone NAAQS. When EPA's lawyers said in the original brief that Subpart 2 is inapplicable to non attainment areas under the new ozone standard, I assume they must have meant that even under the new standard, Subpart 2 continues to apply to areas covered by Table 1--not that Subpart 2 no longer applies at all. Viewed this way, EPA's original brief and its petition for rehearing are perfectly consistent with the final rule: all three interpret the Act to mean that Subpart 2 still applies to an area until it attains the one-hour 0.12 ppm standard. This interpretation puts to rest the panel's concern that Subpart 2's attainment schedule "would have been stillborn had the EPA revised the ozone NAAQS immediately after the Congress enacted the 1990 amendments." ATA, 175 F.3d at 1050.
 The Agency's petition also explains the practical consequences of its interpretation of Subpart 2. Although EPA may not enforce a stricter ozone standard in Los Angeles earlier than the year 2012, see id., at 1049, the Agency need not wait for Los Angeles to achieve the old standard before requiring the rest of the country to move toward cleaner air. Cf. EPA Pet. Reh'g at 25 (suggesting that Los Angeles "is the only area of the nation" where compliance with the 0.08 ppm NAAQS under Subpart 1 could possibly be required at the same time as compliance with the 0.12 ppm NAAQS under Subpart 2). In other words, Table 1 functions as a safe harbor for areas like Los Angeles whose ozone levels exceed 0.121 ppm.
 To sum up, the panel rejected what it was led to believe was EPA's view that Subpart 2 applied only to non attainment areas under the old standard but no longer applies at all under the new standard. The panel held instead that Subpart 2 applies to all non attainment areas under any standard, foreclosing implementation of a new standard in any area not covered by Table 1. EPA has now clarified its interpretation of the Act. A middle ground originally articulated in its final rule making, the Agency's position harmonizes its general enforcement authority under Subpart 1 with the specific provisions of Subpart 2. Subpart 2 continues to govern those areas covered by Table 1, just as it did under the old NAAQS, but in areas that have attained the old standard, nothing precludes enforcement of the new standard under Subpart 1.
 I would have granted rehearing and held that the Agency's position represents a reasonable interpretation of an ambiguous statute. See Chevron, 467 U.S. at 844 (upholding EPA's construction of NAAQS attainment provisions of the Clean Air Act, stating that "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."). I nonetheless concur in the judgment because the revised opinion's statement that "the EPA can enforce a revised primary ozone NAAQS only in conformity with Subpart 2" leaves open the possibility that the new ozone standard can be implemented in areas that have attained the old standard.
 For the reasons set forth in my statement dissenting from the denial of rehearing en banc, I respectfully dissent from the denial of rehearing as to Part I of the panel opinion ("Delegation").
 On Respondent EPA's Suggestion for Rehearing En Banc
 Before: Edwards, Chief Judge, Wald, Silberman, Williams, Ginsburg, Sentelle, Henderson, Randolph, Rogers, Tatel, and Garland, Circuit Judges.
 Circuit Judges Wald and Henderson did not participate in this matter.
 Chief Judge Edwards and Circuit Judges Silberman, Rogers, Tatel, and Garland would grant the suggestion.
 A statement of Circuit Judge Silberman dissenting from the denial of rehearing en banc is attached.
 A statement of Circuit Judge Tatel dissenting from the denial of rehearing en banc, in which Chief Judge Edwards and Circuit Judge Garland join, is attached.
 O R D E R
 Per Curiam
 Respondent EPA's Suggestion for Rehearing En Banc and the responses thereto have been circulated to the full court. The taking of a vote was requested. Thereafter, a majority of the judges of the court in regular active service did not vote in favor of the suggestion. Upon consideration of the foregoing, it is
 ORDERED that the suggestion be denied.
 Silberman, Circuit Judge, dissenting from the denial of rehearing en banc:
 The panel's reliance on the non delegation doctrine to reject EPA's interpretation of section 109 of the Clean Air Act is rather ingenious, but I regret that it seems to me to be fundamentally unsound. I do not think that doctrine can be employed to force an agency to narrow a broad legislative delegation from Congress.
 The doctrine, as Judge Tatel in dissent pointed out, American Trucking Ass'n v. EPA, 175 F.3d 1027, 1057-58 (D.C. Cir. 1999) ("ATA") (Tatel, J., dissenting in part), is at this stage of constitutional "evolution" not in particularly robust health. Justice Rehnquist heroically attempted to inject vitality into the doctrine in his powerful concurrence in the Benzene case, see Industrial Union Dep't, AFL-CIO v. American Petroleum Inst., 448 U.S. 607, 671 (1980). But, sad to say, his view is not shared by a majority of the Court which has acknowledged only a theoretical limitation on the scope of congressional delegations to the executive branch. See Mistretta v. United States, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting) ("What legislated standard, one must wonder, can possibly be too vague to survive judicial scrutiny, when we have repeatedly upheld, in various contexts, a 'public interest' standard?").
 To be sure, the plurality in the Benzene case ostensibly relied on the doctrine to support its interpretation of the Occupational Safety and Health Act. See Benzene, 448 U.S. at 645-46. But a careful reading of the plurality opinion (not, of course, an opinion of the Court, which would bind us) reveals that the doctrine was only a makeweight, tossed into the analysis, in light of Justice Rehnquist's concurrence, to help justify the result. The plurality, disturbed at the seemingly draconian impact of the Secretary of Labor's standard as applied to several industries, analytically conflated the scope of the Secretary's discretion--the legitimate concern of the non delegation doctrine--with the regulatory consequences of his interpretation of the statute. Id. at 645. The latter concern is not really germane to the doctrine; indeed, the Secretary was actually claiming he had less discretion than the plurality thought he had. Accordingly, the Benzene plurality opinion gives only lip service to the non delegation doctrine; the boundaries limiting the scope of congressional delegation to the executive branch remain only dimly perceivable. I agree with Judge Tatel that the terminology of this section of the Clean Air Act does not come so close to those boundaries to raise a serious constitutional problem.
 If it did, and we were faced with two conflicting interpretations of the statute--both plausible--I have no doubt that a constitutionally dubious agency interpretation could be rejected even in a post-Chevron era. The majority questions that proposition-and confuses the issue--by stating that "the approach of the Benzene case ... has given way to the approach of Chevron." Slip Op. on Reh'g at 8. The Supreme Court's opinion in Rust v. Sullivan, 500 U.S. 173, 191 (1991), is to the contrary. See also infra at 1 (Tatel, J., dissenting from denial of rehearing en banc) (citing Mistretta, 488 U.S. at 373 n.7). In other words, the constitutional avoidance canon trumps Chevron deference. But that principle is not relevant to this case. Even assuming the statute was problematic, the panel was not faced with two competing constructions, one of which might be thought to avoid constitutional difficulty. Indeed, the panel concluded that there are no intelligible principles "apparent from the statute" that brought EPA's discretion within constitutionally acceptable limits. ATA, 175 F.3d at 1034. If the panel believed that was so, it should have held the statute unconstitutional. Instead the panel, purporting to rely on Chevron, remanded to EPA directing that agency to come up with an artificially narrow interpretation with various suggestions offered by the panel to accomplish that end.[1] Id. at 1038-40. By so doing, I believe the panel undermines the purpose of the non delegation doctrine.
 That purpose is, of course, to ensure that Congress makes the crucial policy choices that are carried into law. The ability to make those policy choices (even if only at a broad level of generality) is what is meant by legislative power. See U.S. Const. art. I, 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States."). It hardly serves--indeed, it contravenes--that purpose to demand that EPA in effect draft a different, narrower version of the Clean Air Act.[2] Under that view Congress would be able to delegate almost limitless policymaking authority to an agency, so long as the agency provides and consistently applies an "intelligible principle."[3]
 That is not to say that EPA is totally free to exercise its authority at any point on the discretionary continuum that Congress delegated to it in the Clean Air Act. The Administrative Procedure Act's arbitrary and capricious standard also limits the agency's actions. As we have observed, the broader the substantive statutory delegation the more likely that the agency's policy choices will be confined by the APA, rather than the substantive statute. See National Ass'n of Regulatory Comm'rs v. ICC, 41 F.3d 721, 727 (D.C. Cir. 1994) ("Whether an agency action is to be judged as reasonable, in accordance with the APA's general arbitrary and capricious standard, or whether it is to be examined as a permissible interpretation of the statute vel non depends, at least theoretically, on the scope of the specific congressional delegation implicated."). In that regard, I am quite uncertain whether EPA's regulatory choice meets that test. Judge Tatel's emphasis on the agency's extensive procedures does not appear to me to answer the question. It would not matter whether the agency "actually adhered to a disciplined decision making process," ATA, 175 F.3d at 1059, if its final product was unreasonable. If we were to rehear the case, I would focus on that issue.
 Doctrine aside, then, what is the practical difference between my approach and the panel's? The answer, I think, is that the panel engages--and by retaining jurisdiction promises to continue to engage, see id., 175 F.3d at 1057--in a more searching review than the arbitrary and capricious standard would permit. By treating this case as a statutory interpretation question laden with constitutional implications the panel implicitly asserts a greater role for a reviewing court than is justified.
 * * * *
 I respectfully dissent from our denial of rehearing en banc.
 Notes:
 
 
 [1]
 Like the plurality opinion in Benzene, these suggestions seem more directed to encouraging wiser policy choices than interpreting the statute at issue.
 
 
 [2]
 The panel acknowledges this purpose but, relying on an old district court opinion as primary support, claims that its approach preserves two other rationales of the doctrine, limiting the ability of agencies to exercise delegated authority arbitrarily and providing meaningful standards for judicial review. See ATA, 175 F.3d at 1038 (citing Amalgamated Meat Cutters v. Connally, 337 F. Supp. 737, 758-59 (D.D.C. 1971). But these "purposes" are obviously derivative of the doctrine's primary function of ensuring that Congress makes key policy decisions. It is, after all, only this so-called "third" purpose, see id., that has any connection to the doctrine's constitutional source.
 
 
 [3]
 It is true that we used a similar approach in Industrial Union, UAW v. OSHA ("Lockout-Tagout I"), 938 F.2d 1310 (D.C. Cir. 1991). Although one could distinguish that case, I think it rests on a similarly flawed analysis of the doctrine.
 Tatel, Circuit Judge, with whom Edwards, Chief Judge, and Garland, Circuit Judge, join, dissenting from the denial of rehearing en banc:
 In explaining why they remain convinced that the Clean Air Act contains an unconstitutional delegation of legislative power, my colleagues merely repeat that EPA has failed to articulate a sufficiently limiting principle. See Slip Op. on Reh'g at 6-7. They then launch into a discussion of the proper remedy once a court encounters a problematic legislative delegation and conclude that "the approach of the Benzene case ... has given way to the approach of Chevron."Slip Op. on Reh'g at 8. But see supra at 14-15 (Silberman, J., dissenting from the denial of rehearing en banc); Mistretta v. United States, 488 U.S. 361, 373 n.7 (1989) ("In recent years, our application of the non delegation doctrine principally has been limited to the interpretation of statutory texts, and more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional. See, e.g., [the Benzene case.]").
 The issues discussed by my colleagues have no relevance to the constitutional question we face. As I pointed out in my dissent, the Clean Air Act's requirement that EPA set air quality standards "requisite to protect the public health" with "an adequate margin of safety" based on criteria that "accurately reflect the latest scientific knowledge" is far more specific than the sweeping statutory delegations consistently upheld by the Supreme Court for more than sixty years. 42 U.S.C. 7409(b)(1), 7408(a)(2). See, e.g., National Broadcasting Co. v. United States, 319 U.S. 190, 225-26 (1943) (upholding delegation to the FCC to regulate broadcast licensing in the "public interest"); American Trucking Ass'n, Inc. v. EPA, 175 F.3d 1027, 1057-58 (D.C. Cir. 1999) (Tatel, J., dissenting in part) (collecting cases). In language particularly relevant to the highly technical and scientific process of setting national ambient air quality standards, the Supreme Court in Mistretta said this about the non delegation doctrine:"[O]ur jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." 488 U.S. at 372. Such extensive and unambiguous Supreme Court precedent is more than enough to sustain the Clean Air Act's delegation of authority to the EPA. For purposes of constitutional analysis, we thus have no need to require that EPA state "a far more determinate basis for decision" beyond the intelligible principle Congress provided in the Clean Air Act. ATA, 175 F.3d at 1037.Nor have we any reason to consider what remedies might be available were we faced with a statute that failed to meet constitutional standards. Unless petitioners can persuade the Supreme Court to return to the days of Schechter Poultry, this "inferior" court has no authority to demand anything more from either EPA or Congress.
 Neither American Lung Ass'n v. EPA, 134 F.3d 388 (D.C. Cir. 1998), nor the Benzene case, both heavily relied upon by petitioners in their opposition to the suggestion for rehearing en banc, supports the panel's opinion. No one in American Lung doubted the constitutionality of section 109's directive that EPA establish NAAQS "requisite to protect the public health." Applying the familiar arbitrary and capricious standard, we held only that the Agency, in setting the sulfur dioxide NAAQS, had failed adequately to explain its application of section 109. See American Lung, 134 F.3d at 392.The Benzene plurality stated nothing more than that section 3(8) of the OSHA statute implicitly requires the Agency to make a threshold finding that a substance to be regulated causes "significant risks of harm." 448 U.S. at 641. In support of this inference, the plurality pointed to the statute's structure, context, and legislative history, see id. at 642-45, adding that a broader reading "might" amount to an unconstitutional delegation, id. at 646. The conclusion that Congress may constitutionally delegate authority to OSHA to regulate "significant" risks of harm hardly supports the panel's holding that Congress may not constitutionally delegate authority to EPA to issue NAAQS "requisite" to protect the public health--a standard more restrictive than the one the Supreme Court derived and approved in the Benzene case.
 The panel's non delegation holding plainly "involves a question of exceptional importance" warranting en banc review. Fed. R. App. P. 35(a). Not only did the panel depart from a half century of Supreme Court separation-of-powers jurisprudence, but in doing so, it stripped the Environmental Protection Agency of much of its ability to implement the Clean Air Act, this nation's primary means of protecting the safety of the air breathed by hundreds of millions of people. See H.R. Rep. No. 101-490, pt. 1, at 144-45 (1990).
 Before: Edwards, Chief Judge, Wald, Silberman, Williams, Ginsburg, Sentelle, Henderson, Randolph, Rogers, Tatel, and Garland, Circuit Judges.
 Circuit Judges Wald and Henderson did not participate in this matter.
 O R D E R
 Per Curiam
 Upon consideration of the petitions for rehearing en banc of intervenors-respondents New Jersey and Massachusetts in Nos. 97-1440 and 97-1441, Citizens for Balanced Transportation, et al. in No. 97-1440 and the American Lung Association in Nos. 97-1440 and 97-1441, and the absence of a request by any member of the court for a vote, it is
 ORDERED that the petitions be denied.