Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 12, 2006      Decided December 22, 2006

No. 04-1200

SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

NATIONAL ENVIRONMENTAL DEVELOPMENT ASSOCIATION'S
CLEAN AIR REGULATORY PROJECT, ET AL.,
INTERVENORS

———

Consolidated with
No. 04-1201, et al.

———

On Petitions for Review of a Final Rule of the
Environmental Protection Agency

———

*David S. Baron* argued the cause for the Environmental petitioners and South Coast Air Quality Management District.

With him on the briefs were *Howard I. Fox*, *Ann B. Weeks*, *Jonathan F. Lewis*, *Barbara B. Baird*, and *Adam Babich*. *Kurt R. Wiese* entered an appearance.

*William L. Pardee*, Assistant Attorney General, Attorney General's Office of Commonwealth of Massachusetts, argued the cause for petitioner Commonwealth of Massachusetts, et al. With him on the briefs were *Thomas F. Reilly*, Attorney General; *Richard Blumenthal*, Attorney General, Attorney General's Office of the State of Connecticut, *Kimberly Massicotte* and *Matthew Levine*, Assistant Attorneys General; *Carl Danbert*, Attorney General, Attorney General's Office of the State of Delaware, *Valerie S. Csizmadia*, Deputy Attorney General; *G. Steven Rowe*, Attorney General, Attorney General's Office of the State of Maine, *Gerald D. Reid*, Assistant Attorney General; *Robert J. Spagnoletti*, Attorney General, Attorney General's Office of the District of Columbia, *Todd S. Kim*, Solicitor General, *Edward S. Schwab*, Deputy Attorney General, *Donna M. Murasky*, Senior Litigation Counsel; *Eliot Spitzer*, Attorney General, Attorney General's Office of the State of New York, *J. Jared Snyder*, *David A. Munro*, and *Lisa S. Kwong*, Assistant Attorneys General; and *Robert A. Reiley*, Counsel, Commonwealth of Pennsylvania, Department of Environmental Protection.

*John K. McManus*, Assistant Attorney General, Attorney General's Office of State of Ohio, argued the cause for petitioner State of Ohio. With him on the briefs was *Dale T. Vitale*, Assistant Attorney General.

*Frank S. Craig, III* argued the cause for the Industry petitioners. With him on the briefs were *Charles H. Knauss*, *Robert V. Zener*, *John B. King*, *Steven J. Levine*, and *Patrick O'Hara*.

*David J. Kaplan*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *John C. Cruden*, Assistant Attorney General, *Natalia T. Sorgente*, Attorney, and *Jan M. Tierney*, Attorney, U.S. Environmental Protection Agency. *Eric G. Hostetler*, Attorney, U.S. Department of Justice, entered an appearance.

*David S. Baron* and *Howard I. Fox* were on the brief of the Environmental intervenors.

*Charles H. Knauss*, *Leslie S. Ritts*, *Lorane F. Hebert*, *Norman W. Fichthorn*, *Lucinda Minton Langworthy*, *Allison D. Wood*, *Leslie A. Hulse*, *Richard S. Wasserstrom*, *Maurice H. McBride*, *Ralph J. Colleli*, *M. Elizabeth Cox*, *Jan S. Amundson*, and *Quentin Riegel* were on the brief of the Industry intervenors in support of Respondent.

*Frank S. Craig, III*, *John B. King*, *Geraldine E. Edens*, and *Frederick R. Anderson* were on the brief of *amici curiae* The Chamber of Greater Baton Rouge, et al. in support of Respondent.

Before: HENDERSON, ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This case consolidates challenges to the Final Phase 1 Rule To Implement the 8-Hour Ozone National Ambient Air Quality Standard, 69 Fed. Reg. 23,951 (Apr. 30, 2004) (codified at 40 C.F.R. parts 40, 51, 81) (hereinafter "2004 Rule"), promulgated by the Environmental Protection Agency pursuant to the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7401 *et seq.* Because EPA has failed to heed the restrictions on its discretion set forth in the Act, we grant the petitions in part, vacate portions of the rule, and

remand the matter to EPA for further proceedings.

**I.**

The earliest clean air laws date back to the nineteenth century, when industrial cities sought to reduce smoke emissions. *See* GARY C. BRYNER, BLUE SKIES, GREEN POLITICS: THE CLEAN AIR ACT OF 1990 AND ITS IMPLEMENTATION 98 (2d ed. 1995). It was not until much later that the federal government became involved. The first Clean Air Act was passed in 1963, *see* Pub. L. No. 88-206, 77 Stat. 392 (1963), but this effort, supplying little more than research funding, bore little resemblance to the comprehensive scheme that Congress would later impose.

The Clear Air Act Amendments of 1970 introduced the now-familiar arrangement of state-federal cooperation. *See* Clean Air Act Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676 (1970). EPA was to prescribe a primary national ambient air quality standard ("NAAQS") for airborne pollutants that was "requisite to protect the public health." *Id.* § 4(a), 84 Stat. at 1678-80 (codified at 42 U.S.C. § 7409). The NAAQS was to be attained by a state implementation plan ("SIP"), developed by the state and approved by EPA, that introduced sufficient pollution control techniques so as to reach attainment by 1975, with the possibility of a one-time extension of two more years. *Id.* § 4(a), 84 Stat. at 1680-82 (codified at 42 U.S.C. § 7410 (amended 1977)). This approach, which applied identically to all "criteria" pollutants, proved overly ambitious. Congress amended the Act in 1977, extending the attainment deadlines until December 31, 1987. Pub. L. No. 95-95, § 129(b), 91 Stat. 685, 746-47 (codified at 42 U.S.C. § 7502(a)(2) (amended 1990)).

With the new deadline approaching and penalties looming

for states yet to attain, Congress stepped in again.  By this time, Congress was considering new approaches to deal with unclean air.  *See* Henry A. Waxman, *An Overview of the Clean Air Act Amendments of 1990*, 21 ENVTL. L. 1721, 1731-33 (1991) (hereinafter "*Overview*").   The existing approach, which specified the ends to be achieved but left broad discretion as to the means, had done little to reduce the dangers of key contaminants.   For example, Don Theiler, Director of the Wisconsin Bureau of Air Management, appearing on behalf of two national associations of state-and-local air-control agencies, testified that between August 1987 and February 1989, the number of areas violating the ozone NAAQS had increased, from seventy to ninety, exposing as many as 95 million people to unhealthy levels of ozone.  *See Clean Air Act Standards: Hearing Before the Subcomm. on Health and the Environment of the H. Comm. on Energy and Commerce*, 101st Cong. 30 (1989).  In light of such failures, Congress culminated nearly ten years of hearings and debates by enacting the 1990 Amendments to the Act.  Pub. L. No. 101-549, 104 Stat. 2399 (Nov. 15, 1990).  This version of the Act provides the backdrop for the petitions before the court.

The 1990 Amendments abandoned the discretion-filled approach of two decades prior in favor of more comprehensive regulation of six pollutants that Congress found to be particularly injurious to public health: ozone, carbon monoxide, small particulate matter, sulfur dioxide, nitrogen dioxide, and lead.  *See* CAA §§ 181-192, 42 U.S.C. §§ 7511-7514a.  The old ends-driven approach that had proven unsuccessful for these pollutants was redesignated Subpart 1 (of Part D of Title I), which Congress instructed "shall not apply with respect to nonattainment areas for which attainment dates are specifically provided under other provisions of this part."   CAA § 172(a)(2)(D), 42 U.S.C. § 7502(a)(2)(D).  In place of Subpart 1, Congress enacted Subpart 2 to deal with the specific problem of

ozone. *See* CAA §§ 181-185B, 42 U.S.C. §§ 7511-7511f. Ozone, an essential presence in the atmosphere's stratospheric layer, is dangerous at ground level. There, ozone is formed by the chemical reaction of nitrogen oxides ("$NO_x$") with any of a number of volatile organic compounds ("VOCs"), in the presence of sunlight. *See West Virginia v. EPA*, 362 F.3d 861, 865 (D.C. Cir. 2004). Ground-level ozone is a key component of urban smog and exposure to high concentrations "can cause lung dysfunction, coughing, wheezing, shortness of breath, nausea, respiratory infection, and in some cases, permanent scarring of the lung tissue." *Overview*, *supra*, at 1758; *see* S. REP. NO. 101-228, at 6 (1989), *reprinted* in 5 COMM. ON ENV'T & PUB. WORKS, U.S. SENATE, A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990, at 8338, 8346 (hereinafter "LEGISLATIVE HISTORY").

No longer willing to rely upon EPA's exercise of discretion, Congress adopted a graduated classification scheme that prescribed mandatory controls that each state must incorporate into its SIP. Thus, as of the date of enactment of the 1990 Amendments, areas failing to reach attainment under the NAAQS would become, upon such designation by EPA, subject to Subpart 2 requirements by operation of law. *See* CAA § 181(a)(1), 42 U.S.C. § 7511(a)(1). Under Subpart 2, each area was to be classified according to its design value—the measured concentration of ground-level ozone. The statutory Table 1 provided that areas were to be classified as Marginal, Moderate, Serious, Severe, or Extreme depending upon how much the design value exceeded the NAAQS at the time of designation. CAA § 181(a) tbl.1, 42 U.S.C. § 7511(a) tbl.1. Areas with greater problems were given more time to attain the NAAQS but a harsher set of mandatory controls, including provisions for demonstrations of reasonable further progress, $NO_x$ control, motor vehicle emissions control, and new source review. *See* CAA § 182, 42 U.S.C. § 7511a. Areas that failed to meet a

deadline were to be reclassified to a higher classification automatically, thereby according more time to comply with the NAAQS while subjecting that area to more stringent mandatory controls. CAA § 181(b)(2), 42 U.S.C. § 7511(b)(2). This protocol was prescribed whether or not that area was closer to attainment when it missed the deadline than when it was originally classified. For Severe and Extreme areas that still had not reached attainment by November 15, 2005 or 2010, respectively, the Act called for the imposition of penalties to provide incentives for major polluters to reduce VOC emissions. *See* CAA § 185, 42 U.S.C. § 7511d. Under the 1990 Amendments, the NAAQS stood at 0.12 parts per million ("ppm"), measured as the maximum average concentration for a one-hour period during a calendar year. *See* 40 C.F.R. § 50.9(a) & app. H. This regulatory scheme remained in place until 1997.

Although Subpart 2 of the Act and its Table 1 rely upon the then-existing NAAQS of 0.12 ppm, measured over a one-hour period, elsewhere the Act contemplates that EPA could change the NAAQS based upon its periodic review of "the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health" that the pollutant may cause. CAA §§ 108(a), 109(d), 42 U.S.C. §§ 7408(a), 7409(d). The Act provides that EPA may relax a NAAQS, but in so doing, EPA must "provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation." CAA § 172(e), 42 U.S.C. § 7502(e). This provision protects against backsliding.

In 1997, citing a new scientific understanding that prolonged ozone exposure was more harmful to public health than the short-term exposure then regulated, EPA promulgated a rule setting a new NAAQS for ambient ozone. *See* NAAQS for Ozone, 62 Fed. Reg. 38,856 (July 18, 1997) (codified at 40

C.F.R. §§ 50.9, 50.10) (hereinafter "1997 Rule"). The new NAAQS replaced the one-hour, 0.12 ppm standard with an eight-hour, 0.08 ppm standard, now measured as the fourth-highest daily level in a calendar year. *Id.* The new standard thus both changed the measuring scheme and was marginally more stringent, as EPA recognized that an eight-hour level of 0.09 ppm would have "generally represent[ed] the continuation of the present level of protection." *Id.* at 38,858. Alongside its revised standard, EPA also announced an implementation "guidance" indicating its intention to phase out the one-hour standard only after "EPA determines that the area has air quality meeting the 1-hour standard," *id.* at 38,894 (codified at 40 C.F.R. § 50.9(b)), while implementing the eight-hour standard under the generic Subpart 1 of the Act, *id.* at 38,873.

On petitions for review, this court held, in relevant part, that under *Chevron*[1] Step 1 EPA could not use the discretion-filled Subpart 1. Congress had expressed its clear intent that the mandatory control scheme it set forth in Subpart 2 was to be used to regulate ozone. *Am. Trucking Ass'ns v. EPA*, 175 F.3d 1027, *amended on reh'g*, 195 F.3d 4 (D.C. Cir. 1999). On certiorari, the Supreme Court agreed that Subpart 2 "unquestionably" "provide[s] for classifying nonattainment ozone areas under the revised standard," but disagreed that the case could be resolved exclusively under *Chevron* Step 1. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 482-86 (2001). Instead, the Court recognized that

> to the extent that the new ozone standard is stricter than the old one, the classification system of Subpart 2 contains a gap, because it fails to classify areas whose ozone levels are greater than the new standard (and

---

[1] *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (employing two-step analysis).

> thus nonattaining) but less than the approximation of the old standard codified by Table 1.

*Id.* at 483 (citations omitted). In addition to this classification gap, the Court also found a measurement gap and a timing gap: the one-hour averages could not well be used to evaluate eight-hour ozone concentrations and the deadlines set forth in Table 1 would "make no sense for areas that are first classified under a new standard after November 15, 1990." *Id.* at 483-84. The Court therefore indicated that "[t]hese gaps in Subpart 2's scheme prevent us from concluding that Congress clearly intended Subpart 2 to be the exclusive, permanent means of enforcing a revised ozone standard in nonattainment areas." *Id.* at 484. Thus, it "would defer to the EPA's reasonable resolution of that ambiguity" under *Chevron* Step 2. *Id.*

While recognizing the existence of these gaps, the Supreme Court was careful to emphasize their narrow scope. EPA was not "to render Subpart 2's carefully designed restrictions on EPA discretion utterly nugatory," nor could it "construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion." *Id.* at 484-85. Because "Subpart 2 was obviously written to govern implementation for some time," EPA's 1997 approach, leaving Subpart 2 "abruptly obsolete," was "astonishing." *Id.* at 485. Thus, while EPA was invited to exercise its discretion as to the relationship between Subparts 1 and 2, the Court instructed that the range of reasonable interpretations was constrained.

In 2003, with the eight-hour NAAQS still awaiting implementation by EPA, several environmental groups sued seeking adherence by EPA to its obligation to designate nonattainment areas under section 107(d)(1) of the Act, 42 U.S.C. § 7407(d)(1). *See* Air Quality Designations and Classifications for the 8-Hour Ozone NAAQS, 69 Fed. Reg.

23,858, 23,860 (Apr. 30, 2004). EPA entered into a consent decree requiring it to issue the designations by April 15, 2004. *Id.*

On April 30, 2004, EPA promulgated the implementation rule, 69 Fed. Reg. 23,951, which announced a new approach to ozone regulation. Reversing its 1997 position, EPA announced that the one-hour NAAQS would be withdrawn "in full," one year following the effective date of the eight-hour NAAQS designations. *Id.* at 23,954 (codified at 40 C.F.R. § 50.9(b)). Under the 2004 Rule, Subpart 2 would apply only to areas that were nonattaining under both the eight-hour standard and the now-revoked one-hour standard. *Id.* at 23,958. Subpart 1 would apply to the remaining eight-hour nonattainment areas (i.e., those with eight-hour design values greater than 0.08 ppm but one-hour design values no greater than 0.12 ppm). EPA reasoned that placing more areas under the "more flexible provisions of the CAA" would "provide the States and Tribes with greater discretion in determining the mix of controls needed to expeditiously attain the 8-hour NAAQS." *Id.* As a result, 76 of 122 nonattaining areas would be governed by Subpart 1. *See* Proposed Rule To Implement the 8-Hour Ozone NAAQS, 68 Fed. Reg. 32,802, 32,814 (June 2, 2003) (hereinafter "2003 NOPR").

In addition to this interpretation of the classification gap, the 2004 Rule also addressed the measurement and timing gaps. Whereas the 1990 Amendments prescribed classifying areas as of that date and starting the attainment clock on November 15, 1990, under the 2004 Rule, areas would be redesignated under the eight-hour standard as covered by Subpart 1 or one of the five categories of Subpart 2 (Marginal, Moderate, Serious, Severe, or Extreme) according to a regulatory translation of Table 1. *Id.* at 23,998 (codified at 40 C.F.R. § 50.903(a) tbl.1). EPA's translation meant that areas with the same percentage

deviation from the one-hour NAAQS and the eight-hour NAAQS would be classified the same. *Id.* at 23,957. The deadlines for attainment set forth in Table 1 were interpreted to restart as of the date of classification under the new standard. *See id.* at 23,966-67. Because air quality had improved since 1990, the net effect of the new approach was that many areas would have a lower classification for eight-hour ozone than they had for one-hour ozone. Recognizing that this could result in areas being subjected to less stringent controls, EPA interpreted the anti-backsliding provision, section 172(e) of the Act, and reasoned that "if Congress intended areas to remain subject to the same level of control where a NAAQS was relaxed, they also intended that such controls not be weakened where the NAAQS is made more stringent." *Id.* at 23,972. As a result, the 2004 Rule mandates that all "controls" from the one-hour era must remain in place, including controls that a state was already obligated to adopt but as yet had not. *Id.* However, EPA determined that only certain of the programs established by Congress in Subpart 2 constituted applicable "controls"; the others would not need to be retained. So, the 2004 Rule authorized states to remove from their SIPs one-hour New Source Review ("NSR"), section 185 penalty provisions for Severe and Extreme areas, conformity demonstrations, and attainment contingency plans. *Id.* at 23,984-85.

## II.

In these consolidated petitions, a host of parties challenge the 2004 Rule and related EPA decisions on rehearing.[2] No

_____

[2] After limited reconsideration proceedings also challenged here, EPA reaffirmed the 2004 Rule as to NSR, *see* Nonattainment Major New Source Review Implementation Under 8-Hour NAAQS: Reconsideration, 70 Fed. Reg. 39,413 (July 8, 2005) (hereinafter "NSR Reconsideration"), and made additional findings as to penalties,

petitioner disputes that the eight-hour standard must be implemented; instead, they differ as to how quickly it must be attained and under what constraints. Parties with similar concerns were grouped for briefing purposes, leaving four principal opponents to various aspects of the 2004 Rule: the State petitioners,[3] the Environmental petitioners, the Industry petitioners, and the State of Ohio. A subset of the petitioners also intervened to support different aspects of the 2004 Rule to which other petitioners objected. To summarize the challenges: The State and Environmental petitioners contend that EPA's understanding of the interrelationship between Subpart 1 and Subpart 2 contravenes the Act and led to arbitrary and capricious choices reflected in the 2004 Rule. The State of Ohio contends that EPA erred by establishing an unreasonable timeframe for attainment. One Industry petitioner, the National Petrochemical & Refiners Association ("NPRA"), contends that EPA's translation of the statutory one-hour Table 1, CAA § 181(a) tbl.1, 42 U.S.C. § 7511(a) tbl.1, into a converted regulatory eight-hour Table 1, 40 C.F.R. § 50.903(a) tbl.1, is flawed and thus arbitrary and capricious. Another Industry petitioner, the Chamber of Greater Baton Rouge ("Baton Rouge"), contends that EPA lacks authority to continue to enforce any one-hour requirements against areas with lower eight-hour classifications. The State and Environmental petitioners, conversely, contend that EPA should have retained more of the one-hour control requirements to prevent backsliding, and the Environmental petitioners contend that EPA should not have revoked the one-

---

timing, contingency measures, and attainment demonstrations, *see* Phase 1 Implementation of the 8-Hour Ozone NAAQS: Reconsideration, 70 Fed. Reg. 30,592 (May 26, 2005) (hereinafter "2004 Rule Reconsideration").

[3] The State petitioners are Connecticut, Delaware, Maine, Massachusetts, New York, and the District of Columbia.

hour standard at all.

Upon review of these challenges, the court may reverse any action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." CAA § 307(d)(9), 42 U.S.C. § 7607(d)(9). The court will defer to EPA's statutory interpretations in accordance with the two-step framework of *Chevron U.S.A. Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984); *see Bluewater Network v. EPA*, 372 F.3d 404, 410 (D.C. Cir. 2004). The court first asks "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. However, if "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Upon review of these challenges, for the following reasons, we dismiss Ohio's petition, grant the State petition, grant the Environmental petition in part, and deny the Industry petitions.

**III.**

The State of Ohio petitions for review on the ground that the attainment dates for eight-hour ozone are unreasonably soon and favors waiting to impose the eight-hour standard until the one-hour standard has been achieved. The Act provides that an aggrieved party may petition for judicial review in this court as to any "nationally applicable regulations promulgated, or final action taken, by the Administrator under [the Act.]" CAA § 307(b)(1), 42 U.S.C. § 7607(b)(1). However, "[o]nly an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial

review."  CAA § 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B).  As a result, Ohio is barred from seeking relief from the 2004 Rule.

In its petition for review, Ohio objects to the allegedly unreasonable attainment time-frame adopted by EPA.  Ohio's comments during rulemaking, however, express a different view as to attainment deadlines: that "[EPA's] approach would be a reasonable interpretation of Subpart 2."  Ohio EPA's Comments on the Proposed 8-Hour Ozone Implementation Plan 2.  It is settled law that a party that presents a winning opinion before the agency cannot reverse its position before this court.  *See S. Pac. Transp. Co. v. ICC*, 69 F.3d 583, 588 (D.C. Cir. 1995).

Citing *Appalachian Power Co. v. EPA*, 135 F.3d 791 (D.C. Cir. 1998), Ohio insists that it preserved its challenges in the cover letter to its comments, where it cautioned EPA that "[t]he surest way to develop an implementation plan that holds up to judicial scrutiny would be through an amendment to the Clean Air Act."  Letter from Christopher Jones, Director, Ohio EPA, to Marianne L. Horinko, Acting Administrator, EPA (Aug. 1, 2003).  Under *Appalachian Power*, commenters must be given some leeway in developing their argument before this court, so long as the comment to the agency was adequate notification of the general substance of the complaint.  *Id.* at 817-18.  Moreover, for aggrievement that reaches "key assumptions" of an agency, even the failure to object during the comment period is insufficient to bar review.  *Id.* at 818.  Here, Ohio cannot seriously claim that it put EPA on notice of its objections to the details of the 2004 Rule merely by expressing a general procedural preference in its cover letter.  And even if the attainment deadlines constitute a "key assumption," nothing in *Appalachian Power* supersedes the principle that commenters may not reverse course after their preferred approach is adopted by the agency.  Therefore, Ohio has forfeited its claims and we must dismiss its petition.

**IV.**

The State and Environmental petitioners challenge EPA's resolution of the gap between Subpart 1 and Subpart 2 recognized by the Supreme Court in *Whitman*, 531 U.S. at 483. The State and Environmental petitioners contend that EPA has repeated the errors of the 1997 Rule by promulgating a regulation where 76 of 122 nonattaining areas are projected to be governed by Subpart 1. *See* 2003 NOPR, 68 Fed. Reg. at 32,814. They further contend that the Act does not support any ozone nonattainment areas being regulated exclusively under Subpart 1. Although *Whitman* forecloses the latter contention, we agree that the manner in which the 2004 Rule treats the relationship between Subpart 1 and Subpart 2 fails to adhere to the statutory scheme enacted by Congress in 1990 to address ground-level ozone in nonattainment areas.

**A.**

The purpose of the Clean Air Act has long been "to promote the public health and welfare and the productive capacity of [the Nation's] population." CAA § 101(b)(1), 42 U.S.C. § 7401(b)(1). The promulgation of a primary NAAQS specifically addresses this first component, public health. CAA § 109(b), 42 U.S.C. § 7409(b); *see Am. Petroleum Inst. v. Costle*, 665 F.2d 1176, 1181 (D.C. Cir. 1981). Because Congress recognized that it must attain this level of air-quality public health without resort to any "'magic' solutions," it adopted the comprehensive regulatory requirements of Subpart 2. H.R. REP. NO. 101-490, pt. 1, at 147 (1990), *reprinted in* 2 LEGISLATIVE HISTORY, *supra*, at 3021, 3171.

Had there been no scientific advancements of moment in EPA's view since 1990, the one-hour standard would still be in place. Any area with a one-hour ozone level exceeding 0.121

ppm would be designated nonattainment and all such nonattainment areas would be regulated pursuant to the detailed protocols of Subpart 2. The 1997 Rule changed two aspects of the NAAQS: the measuring stick and the target. Changes in the former provide no basis for the displacement of Congress's well-considered approach for reaching its desired level of public health. EPA acknowledged that the level of public health achieved by 0.121 ppm of one-hour ozone is equivalent to the level of public health achieved by 0.09 ppm of eight-hour ozone. *See Whitman*, 531 U.S. at 483; 1997 Rule, 62 Fed. Reg. at 38,858. Any area failing to achieve the equivalent of Congress's chosen level of public health must be covered by Congress's chosen prophylactic scheme. Therefore, to the extent that the 2004 Rule regulates areas with an eight-hour design value exceeding 0.09 ppm under Subpart 1, EPA has misinterpreted the gap where it is authorized to exercise its discretion and has trespassed into areas where Subpart 2 unquestionably applies.

The Supreme Court in *Whitman* recognized three gaps in the Act that were evident after the 1997 change in the NAAQS. The first gap was a measurement gap: "Using the old 1-hour averages of ozone levels . . . as Subpart 2 requires would produce at best an inexact estimate of the new 8-hour averages." *Whitman*, 531 U.S. at 483 (citations omitted). The second gap was a classification gap: "to the extent that the new ozone standard is stricter than the old one, the classification system of Subpart 2 contains a gap, because it fails to classify areas whose ozone levels are greater than the new standard (and thus nonattaining) but less than the approximation of the old standard codified by Table 1. *Id.* (citations omitted). The third gap was a timing gap: "Subpart 2's method for calculating attainment dates . . . seems to make no sense for areas that are first classified under a new standard after November 15, 1990." *Id.*

The State and Environmental petitioners read the

classification gap quite narrowly. They maintain that this gap merely authorized EPA to adjust Table 1 to incorporate newly nonattaining areas into one of the Subpart 2 categories. Once EPA translated Table 1, its discretion was exhausted. Under this reading, however, all areas would be subject to Subpart 2 as a matter of *Chevron* Step 1. The Supreme Court in *Whitman* indicated otherwise. Although the Court referred to the gap as a "fail[ure] to classify," *Whitman*, 531 U.S. at 483, the Court later said that it could not "conclud[e] that Congress clearly intended Subpart 2 to be the exclusive, permanent means of *enforcing* a revised ozone standard in nonattainment areas." *Id.* at 484 (emphasis added).

EPA interpreted the classification gap differently, indicating "that there was no gap in the statute for those areas with a 1-hour design value above 0.121 ppm." 2004 Rule, 69 Fed. Reg. at 23,957. This reasoning implies that EPA views the gap as a two-dimensional void bounded by 0.121 ppm of one-hour ozone and 0.08 ppm of eight-hour ozone. But this approach would mean that areas with air less healthful than what Congress thought it had addressed could be freed from Subpart 2. This is not the gap that the Supreme Court recognized. The Court characterized the gap as those "areas whose ozone levels are greater than the new standard (and thus nonattaining) but less than *the approximation of the old standard* codified by Table 1." *Whitman*, 531 U.S. at 483 (emphasis added). This statement was preceded by reference to EPA's assertion that the "8-hour standard of 0.09 ppm rather than 0.08 ppm would have 'generally represent[ed] the continuation of the [old] level of protection.'" *Id.* (alterations in original) (quoting 1997 Rule, 62 Fed. Reg. at 38,858).

In other words, the gap identified in *Whitman* affords EPA discretion only to the extent that an area is nonattaining but its air quality is not as dangerous as the level addressed by the 1990

Amendments, which now translates to 0.09 ppm on the eight-hour scale. Thus, the gap extends only to the extent that the standard was *strengthened* and not to the extent that the measurement technique merely changed. Recall that when the Supreme Court assessed the 1997 Rule, it thought that the one- and eight-hour standards were to coexist. *Id.* at 478. But the Court nowhere indicated that the still-present threshold for one-hour compliance should be used to partition eight-hour nonattaining areas. To the contrary, considering the statements of the Court in context strengthens the conclusion that the regulation of the eight-hour standard is to be independent of the one-hour standard. Eight-hour nonattainment areas must be subject to Subpart 2 wherever they have air at least as unhealthful as Congress contemplated when enacting the 1990 Amendments. Because *Chevron* Step 1 controls the extent of the gap, we need not address the State and Environmental petitioners' further contentions that EPA's approach absurdly uses one-hour ozone levels—a metric that EPA concedes is no longer relevant—to determine how to fix eight-hour ozone nonattainment, and that this interpretation, by treating areas with similar eight-hour levels differently, is arbitrary and capricious.

**B.**

For areas with ozone levels between 0.08 and 0.09 ppm, the 2004 Rule overlaps with the gap recognized in *Whitman*. To this extent, the question under *Chevron* Step 2 is whether EPA's interpretation, while not required to "represent[] the best interpretation of the statute," is reasonable. *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 744-45 (1996). Obviously, EPA's approach must be "based on a permissible construction *of the statute*." *Chevron*, 467 U.S. at 843 (emphasis added).

In the 2004 Rule, EPA determined that for all areas where it need not impose Subpart 2 requirements, it will not do so. This conforms to "[o]ne of EPA's stated goals . . . [,] to provide

flexibility to States and Tribes on implementation approaches and control measures within the structure of the CAA." 2004 Rule, 69 Fed. Reg. at 23,958. EPA advances several reasons for its approach: first, "because subpart 2 was developed by Congress 13 years ago and our scientific understanding of the causes of ozone pollution and the transport of ozone and its precursors has significantly advanced," *id.* at 23,960; and second, "[b]ecause control requirements for marginal areas are similar to those for subpart 1 areas, and because most of these areas are projected to attain within 3 years, the distinction in regulatory category may make no practical difference for many of these areas," *id.* at 23,961. *See also* 2003 NOPR, 68 Fed. Reg. at 32,814. Even assuming (without deciding) for purposes of this appeal that the 2004 Rule would be a reasonable approach to reducing air pollution, it is not a reasonable interpretation of Congress's approach in the 1990 Amendments.

The main thrust of EPA's interpretation is that Subpart 1 is best because it maximizes EPA's ability to tailor a SIP to the situation of that state. But at no point does EPA explain how its interpretation fits with the 1990 Amendments, which Congress purposefully crafted to limit EPA discretion. *See Whitman*, 531 U.S. at 485. Further, to the extent EPA's rationale rests on the claims that technology has advanced since 1990, Congress considered this possibility by providing for periodic review of each NAAQS. *See* CAA § 109(d)(1), 42 U.S.C. § 7409(d)(1). There are no comparable provisions providing that Subpart 2 requirements may be stripped away if EPA becomes convinced that it may achieve attainment more efficiently. "[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 338 (1994) (internal quotation marks omitted). The interpretation advanced by EPA cannot be squared with Congress's desire to limit EPA discretion by

devising a plan that would reach far into the future. *See Whitman*, 531 U.S. at 485. As knowledge about the causes and cures of pollution has increased, Congress has not previously hesitated to step in and modify its approach. That Congress has not provided for an agency override of its methodology is telling.

Similarly, EPA's insistence that certain areas should not be subjected to Subpart 2 because they will soon attain the eight-hour NAAQS is untethered to Congress's approach. Congress considered the possibility of areas being classified nonattaining but missing the target by only a small amount. These are the Marginal areas that are required to introduce far less burdensome ozone controls than areas with more polluted air. *See* CAA § 181, 42 U.S.C. § 7511. Thus, even if "Subpart 1 is preferable to mandating unnecessary Subpart 2 controls," Brief for Respondent at 46, EPA cannot replace Congress's judgment with its own.

We therefore hold that the 2004 Rule violates the Act insofar as it subjects areas with eight-hour ozone in excess of 0.09 ppm to Subpart 1. We further hold that EPA's interpretation of the Act in a manner to maximize its own discretion is unreasonable because the clear intent of Congress in enacting the 1990 Amendments was to the contrary.

## V.

Industry petitioner NPRA challenges the conversion of the one-hour Table 1, codified at 42 U.S.C. § 7511(a) tbl.1, to its eight-hour regulatory equivalent, 40 C.F.R. § 50.903(a) tbl.1. We first address EPA's contention that NPRA lacks Article III standing to pursue its claims before this court.

## A.

The doctrine of standing enforces the limitations on the federal judiciary stemming from the Article III case-or-controversy requirement. *See* U.S. CONST. art. III, § 2; *Allen v. Wright*, 468 U.S. 737, 750-51 (1984). A party's standing is a "predicate to any exercise of our jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc).

As an association, NPRA "has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). Only the first element of standing can seriously be challenged here. An individual plaintiff has standing if it can demonstrate injury-in-fact that has been caused by the defendant and that is capable of being redressed by this court's order. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

EPA contests causation on the ground that because only the states are directly affected by the 2004 Rule, and because EPA has not specifically mandated controls, NPRA is only harmed through the intervening acts of the independent third-party states. *See Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004). NPRA responds that it is inevitable that NPRA members will be affected by the 2004 Rule and will be required to install controls either not previously required or at an earlier date than previously anticipated.

In order for NPRA to have standing, there must be a

"'substantial probability' that [EPA's] action 'created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of'" NPRA. *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 6 (D.C. Cir. 2005) (quoting *Fla. Audubon*, 94 F.3d at 669). We have little difficulty concluding that NPRA has met this threshold. It is inconceivable that EPA's comprehensive reworking of an Act that specifically controls the requirements for industrial pollution would fail to affect the requirements of even a single NPRA member. *See Am. Library Ass'n v. FCC*, 406 F.3d 689, 696 (D.C. Cir. 2005); *Bethlehem Steel Corp. v. EPA*, 723 F.2d 1303, 1306 (7th Cir. 1983); *see also Natural Res. Def. Council, Inc. v. EPA*, 902 F.2d 962, 975 n.33 (D.C. Cir. 1990), *vacated in part on other grounds*, 921 F.2d 326 (D.C. Cir. 1991); *Overview*, *supra*, at 1815.

**B.**

NPRA's petition bridges the classification and timing gaps referenced in *Whitman*. *See supra* Part IV.A. The court "defer[s] to the EPA's reasonable resolution of the ambiguity." *Whitman*, 531 U.S. at 484. The essence of NPRA's challenge is that while translating Table 1, EPA failed to acknowledge the differences between one-hour and eight-hour ozone. NPRA raises two main contentions: first, that eight-hour ozone is proportionally more difficult to reduce than one-hour ozone; and second, that EPA adopted the new approach aware that some areas would be unable to meet the prescribed guidelines, instead relying upon the states to reclassify themselves voluntarily.

**1**.

To create an updated version of Table 1, EPA considered a number of approaches for determining the proper deadlines and method of classification. With respect to maximum attainment dates, EPA recognized that "a strict application of Table 1 would produce absurd results for most areas" because most of

the deadlines had already passed, and "promulgat[ed] a targeted revision of Table 1 to reflect attainment dates consistent with Congressional intent." 2004 Rule, 69 Fed. Reg. at 23,966. Because the original attainment dates were linked to the date on which most areas were designated and classified as a matter of law, EPA proposed to use the same time periods and to start the clock as of the time of designation for eight-hour ozone. 2003 NOPR, 68 Fed. Reg. at 32,808.

The other factor influencing attainment deadlines is the mapping of design values onto area classes. For this purpose, EPA proposed

> to translate the classification thresholds in Table 1 of section 181 from 1-hour values to 8-hour values in the following manner: Determine the percentage by which each classification threshold in Table 1 of section 181 exceeds the 1-hour ozone standard and set the 8-hour threshold value at the same percentage above the 8-hour ozone standard. For example, the threshold separating marginal and moderate areas in Table 1 is 15 percent above the 1-hour standard, so we would set the 8-hour moderate area lower threshold value at 15 percent above the 8-hour standard.

*Id.* at 32,812. In response to comments, EPA introduced additional alternatives and reopened the comment period. Under the new Alternative A, the range of the one-hour Table 1 was narrowed so that the eight-hour table used

> 50 percent (instead of 100 percent) of the percentages that the classification thresholds were above the 1-hour NAAQS in our proposed June 2003 translation of Table 1. In other words, since the moderate threshold for the 1-hour NAAQS is 15 percent above the 1-hour

> NAAQS, we would adjust the moderate threshold for purposes of the 8-hour NAAQS to be 7.5 percent above . . . the lowest level in Table 1 for [this alternative].

2004 Rule, 69 Fed. Reg. at 23,957[4]; *see also* Proposed Rule To Implement the 8-Hour Ozone NAAQS, 68 Fed. Reg. 60,054, 60,059 (Oct. 21, 2003). The effect of this approach would be to place more areas in higher classes, giving them more time to attain (while subjecting them to additional mandatory controls).

NPRA maintains that EPA should have adopted the fifty-percent approach or some other approach that delayed attainment deadlines it considered to be unreasonable. The basis for this objection is data provided in the rulemaking comments of the American Petroleum Institute ("API"). *See* Comments of the American Petroleum Institute on the Proposed Rule To Implement the 8-Hour Ozone National Ambient Air Quality Standard 7, 13-14. API presented data suggesting that eight-hour ozone levels fell at only half the rate of one-hour ozone levels during the twenty years ending 2001. *Id.* However, EPA did not find these data compelling, explaining that "[p]rograms designed to address the 1-hour ozone NAAQS were not necessarily designed to reduce 8-hour ozone levels at some prescribed rate." Memorandum from Fred Dimmick, Group Leader, Air Quality Trends Analysis Group, on API Comments Regarding Relation Between Ozone 1-Hour and 8-Hour Trends 2 (Feb. 11, 2004). So the historical data (for which EPA also contested the methodology) are not truly predictive of the relative difficulty in reducing one- and eight-hour ozone.

---

[4] Alternative A also utilized a different approach for distinguishing between Subpart 1 and Subpart 2 areas. All areas with eight-hour design values exceeding 0.091 ppm were categorized under Subpart 2. 2004 Rule, 69 Fed. Reg. at 23,957; *see supra* Part IV.A.

Indeed, EPA's own data suggest that the ratio between eight-hour and one-hour ozone is converging toward a constant proportion, eight-tenths. *See id.* at 2, 4 fig.3. This implies that reducing one-hour and eight-hour ozone levels by the same percentage would be equally difficult. In light of these data, NPRA fails to show that EPA was arbitrary or capricious in adopting the percentage-deviation approach.

**2.**

NPRA's second objection is that EPA acknowledged that its classification scheme may result in some areas that will not be able to attain by the deadline prescribed for their category. For these "misclassified" areas, EPA has decided to rely upon the voluntary bump-up provision of section 181(b)(3).[5] *See* 2004 Rule, 69 Fed. Reg. at 23,959-60. NPRA contends that by resorting to section 181(b)(3), EPA is shirking its classification responsibility, leaving these decisions to the states contrary to Congress's intent. Taken to the extreme, section 181(b)(3) could damage Congress's approach. However, Congress understood that the classification system would not be error-proof and merely chose "outside limits intended to provide a reasonable target for a large class of nonattainment areas." H.R. REP. NO. 101-490, pt. 1, at 229, *reprinted in* 2 LEGISLATIVE HISTORY, *supra*, at 3253.

---

[5] Section 181(b)(3) of the Act provides:

> The Administrator shall grant the request of any State to reclassify a nonattainment area in that State in accordance with [Table 1] to a higher classification. The Administrator shall publish a notice in the Federal Register of any such request and of action by the Administrator granting the request.

42 U.S.C. § 7511(b)(3).

NPRA maintains that EPA anticipates fifteen areas, including major metropolises, will be unable to attain within the time allowed. However, EPA found that its chosen option "provides sufficient time for most areas." 2004 Rule, 69 Fed. Reg. at 23,959. Moreover, its modeling did not incorporate future technological advances. EPA's "repeated experience over the past three decades is that market forces stimulated by the CAA have repeatedly led to technological advances and learning through experience, making it possible over time to achieve greater emissions reductions at lower costs than originally anticipated." *Id.*

In light of the nature of the classification scheme, the availability of section 181(b)(3) bump-ups, and the prospects for future technological improvements credited by EPA, we deny NPRA's petition.

## VI.

The final set of challenges concerns what remains of the old one-hour standard. The Environmental petitioners contend that EPA's revocation of the one-hour standard was unlawful and arbitrary. Short of that, they join the State petitioners in contending that the 2004 Rule violates the anti-backsliding provisions of the Act. Industry petitioner Baton Rouge contends that EPA lacks authority to require any anti-backsliding provisions that do not relate to the eight-hour NAAQS.

### A.

In 1997, EPA determined that, while it was replacing the one-hour NAAQS with an eight-hour NAAQS, it would continue to enforce the one-hour NAAQS until "a determination by the EPA that an area has attained air quality that meets the 1-hour standard." Implementation Plan for Revised Air Quality Standards, 62 Fed. Reg. 38,421, 38,424 (July 18, 1997); *see*

*Whitman*, 531 U.S. at 478; 1997 Rule, 62 Fed. Reg. at 38,873, 38,894-95. In the 2004 Rule, EPA reversed course, opting instead to "revoke the 1-hour standard in full, including the associated designations and classifications, 1 year following the effective date of the designations for the 8-hour NAAQS." 2004 Rule, 69 Fed. Reg. at 23,954. The Environmental petitioners contend that because Congress "codified" the one-hour standard, EPA cannot revoke it. In the alternative, they contend that EPA was arbitrary and capricious in revoking the standard, because maintaining the one-hour standard would also help to reduce eight-hour ozone levels. EPA responds that any challenge to its 1997 Rule is time-barred, and, in any event, its actions are reasonable.

**1.**

The judicial review provision of the Act provides aggrieved parties sixty days in which to petition for review. CAA § 307(b), 42 U.S.C. § 7607(b). Were the Environmental petitioners challenging the revocation of the one-hour standard, which occurred in the 1997 Rule revising the standard, its petition would be out of time and the court could not entertain it. However, we read their petition to challenge only the revocation of the one-hour standard prior to its attainment, as their reply brief makes clear. This objection is timely. *Cf. Clean Air Implemention Project v. EPA*, 150 F.3d 1200, 1204 (D.C. Cir. 1998).

Because the EPA indicated in the 1997 Rule that it had no intention of withdrawing the one-hour standard before all areas had reached attainment, *see* 1997 Rule, 62 Fed. Reg. at 38,873, Environmental petitioners had no reason to lodge their challenge in 1997. The 1997 Rule did not reflect a finding that one-hour ozone was unimportant and that continued regulation was unnecessary. *See id.* at 38,872. As the Environmental petitioners observe, it was only when EPA switched course in

the 2004 Rule, opting to revoke the one-hour standard without awaiting attainment, that their challenge became ripe. This is not a case like *Environmental Defense v. EPA*, 467 F.3d 1329 (D.C. Cir. 2006), where EPA did not change its 1997 regulation when promulgating a 2004 rule. *Id.* at 1333. Because the Environmental petitioners' challenge is timely, we turn to the merits.

**2.**

Section 109(d)(1) of the Act provides that "at five-year intervals . . . , the Administrator shall complete a thorough review of the . . . national ambient air quality standards promulgated under this section and shall make such revisions in such . . . standards as may be appropriate." 42 U.S.C. § 7409(d)(1). The anti-backsliding provision, section 172(e), provides that in the event "the Administrator relaxes a [primary NAAQS] after November 15, 1990, the Administrator shall . . . provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation." 42 U.S.C. § 7502(e).

The Environmental petitioners contend that the one-hour standard cannot be withdrawn because Congress "codified" the one-hour standard in Subpart 2. Congress contemplated, however, the possibility that scientific advances would require amending the NAAQS. Section 109(d)(1) establishes as much, and section 172(e) regulates what EPA must do with revoked restrictions. While certain other provisions in Subpart 1 are explicitly rendered inapplicable to ozone when regulated under Subpart 2, *see* CAA § 172(a)(1), (2), 42 U.S.C. § 7502(a)(1), (2), Section 109(d)(1) is not. *See Am. Trucking Ass'ns*, 175 F.3d at 1047. Therefore, EPA retains the authority to revoke the one-hour standard so long as adequate anti-backsliding provisions are introduced. Additionally, EPA was not, as the Environmental petitioners contend, arbitrary and capricious in

withdrawing the one-hour requirements, having found in 1997 that the eight-hour standard was "generally even more effective in limiting 1-hour exposures of concern than is the current 1-hour standard." 1997 Rule, 62 Fed. Reg. at 38,863. The only remaining requirements as to the one-hour NAAQS are the anti-backsliding limitations.

**B.**

Baton Rouge takes the opposite position and contends that no remnants of the one-hour rule may be retained, except to the extent that controls are already incorporated into SIPs. These controls, however, could be removed pursuant to section 110(*l*) of the Act once the state demonstrates that their removal will not "interfere with any applicable requirement concerning attainment and reasonable further progress" toward the eight-hour standard. 42 U.S.C. § 7410(*l*).

Baton Rouge has suffered from a history of near-misses in ozone attainment. In 1990, the area was classified Serious under Table 1, providing until 1999 to attain. When Baton Rouge missed attainment, by just 0.002 ppm, it was bumped up to Severe status by the terms of the Act. *See* CAA § 181(b)(2), 42 U.S.C. § 7511(b)(2). Baton Rouge had not finished implementing the controls for a Severe area when the eight-hour standard was put into place. Based on its eight-hour design value, Baton Rouge was reclassified under Subpart 2 as Marginal. 40 C.F.R. § 81.319.

Baton Rouge objects to the 2004 Rule insofar as it requires the implementation of Severe controls not yet implemented that it claims do not constitute "applicable requirements" that must be included in SIPs. 40 C.F.R. § 51.900(f); *see* CAA § 172(c)(7), 42 U.S.C. § 7502(c)(7). It contends that it should be subjected only to the requirements for a Marginal eight-hour area, both because these requirements reflect the improved

quality of Baton Rouge's air and because they now constitute the "applicable requirements" under the prevailing NAAQS. It is undisputed, of course, that Baton Rouge would be subject to all of the Severe requirements but for the change in the NAAQS. Baton Rouge's contention is the counterintuitive claim that the strengthening of the NAAQS entitles it to a weaker regulatory regime.

At the center of this dispute is EPA's interpretation of the anti-backsliding provision, section 172(e), 42 U.S.C. § 7502(e). By its terms, Section172(e) applies only when EPA "relaxes" a primary NAAQS, *id.*, but EPA interpreted it to apply here, reasoning that "if Congress intended areas to remain subject to the same level of control where a NAAQS was relaxed, they also intended that such controls not be weakened where the NAAQS is made more stringent." 2004 Rule, 69 Fed. Reg. at 23,972. Considered as a whole, the Act reflects Congress's intent that air quality should be improved until safe and never allowed to retreat thereafter. Even if EPA set requirements that proved too stringent and unnecessary to protect public health, EPA was forbidden from releasing states from these burdens. *See* CAA § 172(e), 42 U.S.C. § 7502(e). Even areas that attained were not allowed to remove controls. At most, an attaining area was allowed to shift controls from active enforcement to the contingency plan that would be automatically triggered should air quality again deteriorate. CAA § 175A, 42 U.S.C. § 7505a. And EPA was to enforce a high threshold for removing controls from a SIP—no mandatory controls could be removed and nothing could be done that would hinder an area's ability to achieve prescribed annual incremental emissions reductions. CAA § 110(*l*), 42 U.S.C. § 7410(*l*). As a result, Baton Rouge's position that Congress intended to allow the scenario it prefers does not withstand scrutiny.

Similarly, Baton Rouge's position that it need not

implement one-hour Serious requirements that were not a part of its SIP when the NAAQS changed fails. A mandatory control that a state is obligated to implement is "applicable" notwithstanding the state's delay in compliance with the requirement. *See* 2004 Rule, 69 Fed. Reg. at 23,972. The Act placed states onto a one-way street whose only outlet is attainment. That Baton Rouge has found attainment more difficult than it apparently expected does not entitle it to reverse course. EPA's interpretation of section 172(e) is to this extent consistent with Congress's expressed intent and therefore is reasonable.

## C.

After interpreting section 172(e) to apply to the strengthening of the ozone NAAQS, EPA proceeded to limit the scope of its interpretation. Finding ambiguity in the word "controls," EPA determined that one-hour NSR, which it characterized as a growth measure, need not be continued. 2004 Rule, 69 Fed. Reg. at 23,985. The State and Environmental petitioners challenge this reinterpretation, as well as EPA's treatment of one-hour penalties, rate-of-progress milestones, contingency plans, and motor vehicle emissions budgets. We conclude that each of these measures is a "control[]" and that withdrawing any of them from a SIP would constitute impermissible backsliding.

## 1.

NSR. NSR is a permitting process that restricts major modifications and new construction based on an area's air-quality classification. *See New York v. EPA*, 443 F.3d 880, 883 (D.C. Cir. 2006). As relevant, NSR requires major facilities to include technology consistent with the lowest achievable emissions rate ("LAER") and to offset any increased emissions with greater reductions elsewhere. *See* CAA § 173, 42 U.S.C. § 7503. As with the rest of the Act, the severity of NSR

restrictions increases as the nonattainment classification worsens. Moving up a classification results in a narrower definition of a "major" facility and imposes a greater offset ratio for any increased VOC emissions. *See* CAA § 182, 42 U.S.C. § 7511a. Areas yet to attain the one-hour NAAQS were classified at best Severe prior to the revocation of the standard. Under one-hour NSR, they must achieve LAER for any source exceeding 25 tons per year of VOC emissions and must offset any increase in VOC emissions by a decrease of 1.3 times that amount. CAA § 182(d), 42 U.S.C. § 7511a(d).

EPA decided that one-hour NSR requirements are no longer required under the Act and that areas should be constrained only by the NSR requirements for their eight-hour classification. 2004 Rule, 69 Fed. Reg. at 23,985. This marked a change from its 2003 NOPR, in which EPA indicated that "the major source applicability cut-offs and offset ratios continue to apply to the extent that the area has a higher classification for the 1-hour standard than for the 8-hour standard[, because w]e see no rationale under the CAA . . . why the existing NSR requirements should not remain 'applicable requirements.'" 2003 NOPR, 68 Fed. Reg. at 32,821. On reconsideration, EPA affirmed the revocation of one-hour NSR. *See* NSR Reconsideration, 70 Fed. Reg. 39,413.

The result of this change is to subject fewer areas to LAER and to offset requirements that themselves are weakened. EPA maintains that this is proper because NSR is not a "control." Instead, EPA defines controls as "mandatory control measures that can be quantified and relied upon in a modeling demonstration to show how the measure helps an area reach attainment." Brief for Respondent at 95; *see also* Nonattainment Major NSR Implementation Under 8-Hour Ozone NAAQS: Reconsideration, 70 Fed. Reg. 17,018, 17,021-23 (Apr. 4, 2005). By this reasoning, because NSR does not provide *a*

*priori* quantifiable emissions reductions, it is not a control. This interpretation does not withstand scrutiny. By attempting to redefine what is a "control" circularly as a subset of itself, EPA violates logic, its own past practice, and the Act's plain meaning.

EPA maintains that States do not rely upon NSR to actively reduce their ozone levels and that NSR was not introduced to achieve emissions reductions. But this is beside the point because EPA nowhere claims that if NSR were not present, there would be no effect on ozone levels. Its arbitrary distinction between actively reducing levels and merely limiting growth finds no support in the nature of "control." Past and current practice confirms that NSR is a control. The Act itself provides that the NSR permit program involves "controls" when section 108(h) requires EPA to "make information regarding emission control technology available to the States and to the general public through a central database" and indicates that "[s]uch information shall include all control technology information received pursuant to State plan provisions requiring permits for sources." 42 U.S.C. § 7408(h). EPA has consistently found NSR to be a control. In its $NO_x$ SIP Call, 63 Fed. Reg. 57,356, 57,442 tbl.IV-2 (Oct. 27, 1998), EPA included NSR in its list of "controls." In a proposed rule regarding particulate matter, EPA sought to apply two statutory clauses because they "apply to [SIP] provisions and control requirements, which include NSR programs." Proposed Rule To Implement the Fine Particle NAAQS, 70 Fed. Reg. 65,984, 66,035 (Nov. 1, 2005); *see also id.* at 66,037. In a turbine regulation earlier this year, it stated that "emission control programs such as . . . NSR already promote or require emission controls that would effectively prevent emissions from increasing." Standards of Performance for Stationary Combustion Turbines, 71 Fed. Reg. 38,482, 38,491 (July 6, 2006). In addition, the court has previously characterized NSR as imposing "control requirements." *New*

*York*, 443 F.3d at 883; *see also Sierra Club v. Costle*, 657 F.2d 298, 338 (D.C. Cir. 1981) (quoting Standards of Performance for New Stationary Sources, 45 Fed. Reg. 8210, 8220 (Feb. 6, 1980)). Furthermore, the House Report introducing the permit program lists NSR as a "control" at least twice. *See* H.R. REP. NO. 101-490, pt. 1, at 166, 168 fig.1, *reprinted in* 2 LEGISLATIVE HISTORY, *supra*, at 3190, 3192 fig.1 ("Modification Offsets").

EPA tries to find ambiguity by interposing section 110(a)(2)(A) against (C) and section 172(c)(1) and (6) against (5). The Sixth Circuit credited this approach in *Greenbaum v. EPA*, 370 F.3d 527 (6th Cir. 2004). However, *Greenbaum* involved a different ultimate question, namely, whether NSR is required for *attainment* areas, and required that court to determine the meaning of a different term, "measures." Because the term "measures" was used in the provision providing for redesignation to attainment, the Sixth Circuit found it appropriate to refer to other instances of "measures" elsewhere in the Act and concluded that NSR was not a "measure." *Id.* at 535-38. This has no bearing on whether NSR is a "control." In light of abundant other evidence that NSR is a control, EPA's attempt to conjure up ambiguity by referring to provisions involving a different noun is unavailing.

We therefore conclude that there is no ambiguity as to the meaning of "control" in Section 172(e), the anti-backsliding provision. Something designed to constrain ozone levels is a "control," and this would include NSR. To conclude otherwise would mean that Congress considered its carefully-crafted and well-calibrated graduated restrictions on new and modified sources less important than other provisions. If anything, the Act and its legislative history reflect the opposite position. *See New York*, 443 F.3d at 887 (citing 42 U.S.C. § 7411(a)(4)); S. REP. NO. 101-228, at 24-25 (1989), *reprinted* in 5 LEGISLATIVE HISTORY, *supra*, at 8364-65.

**2.**

Penalties. The 1990 Amendments took a long-horizon approach to the problem of ozone pollution. Recognizing that some areas would struggle long into the future, the 1990 Amendments extended attainment dates as late as 2005 and 2010. Beyond those deadlines, the 1990 Amendments provided for penalties, CAA § 185(a), 42 U.S.C. § 7511d(a),[6] to encourage areas still yet to attain. Because EPA promulgated the 2004 Rule before the first penalties would have been required in 2005, the provision has never been enforced. EPA uses this convenient timing to argue that the section 185(a) penalties are therefore excluded from the reference in the anti-backsliding provision, section 172(e), to "controls applicable . . . before . . . relaxation." 42 U.S.C. § 7502(e).

EPA reasons that the Act "does not mandate that controls be as stringent as those that could not be required to be imposed until a date after the previous NAAQS no longer exists." 2004 Rule Reconsideration, 70 Fed. Reg. at 30,593. This assertion is untenable. By EPA's reading, the standards could be changed every fourteenth year—just prior to the attainment date—and a

---

[6] Section 185(a) of the Act provides:

> Each implementation plan revision required [for Severe and Extreme ozone nonattainment areas] shall provide that, if the area to which such plan revision applies has failed to attain the [primary NAAQS] for ozone by the applicable attainment date, each major stationary source of VOCs located in the area shall, except as otherwise provided under subsection (c) of this section, pay a fee to the State as a penalty for such failure . . . .

42 U.S.C. § 7511d(a).

state could go unpenalized without ever attaining even the original NAAQS referenced in the 1990 Amendments. The Supreme Court in *Whitman* instructed that

> Subpart 2 was obviously written to govern implementation for some time. . . . A plan reaching so far into the future was not enacted to be abandoned the next time the EPA reviewed the ozone standard—which Congress knew could happen at any time, since the technical staff papers had already been completed in late 1989.

531 U.S. at 485.

As Congress set the penalty deadline well into the future, giving states and industry ample notice and sufficient incentives to avoid the penalties, they were "applicable" before they actually were imposed. For a provision to be "applicable" in this context, it need not be currently enforceable. Congress designed section 185(a) to influence state action prior to 2005, and in this sense, it has long been "applicable." If a group of petitioners believed that the penalties were unlawful and would force the implementation of unnecessary changes, they would have had a ripe claim long ago under *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49, 153 (1967). *Accord Chamber of Commerce v. Reich*, 57 F.3d 1099, 1101 (D.C. Cir. 1995). Because these penalties were designed to constrain ozone pollution, they are controls that section 172(e) requires to be retained. While EPA maintains that it would be impractical to enforce these penalties because EPA will no longer make findings of attainment and conformity assessments as to the one-hour standard, *see* 2004 Rule, 69 Fed. Reg. at 23,985, section 172(e) does not condition its strict distaste for backsliding on EPA's determinations of expediency; EPA must determine its procedures *after* it has identified what findings must be made

under the Act. For these reasons, section 185 penalties must be enforced under the one-hour NAAQS.

**3.**

Milestones. Rate-of-progress milestones apply to areas categorized Moderate and above and require annual percentage reductions in ozone-precursor emissions. CAA § 182(b)(1), (c)(2)(B), (d), (e), 42 U.S.C. § 7511a(b)(1), (c)(2)(B), (d), (e). Serious areas must develop adequate plans to attain three-percent annual reductions over each three-year period until attainment. CAA § 182(c)(2)(B), 42 U.S.C. § 7511a(c)(2)(B); *see Sierra Club v. EPA*, 356 F.3d 296, 299 (D.C. Cir. 2004).

The Environmental petitioners sought review of EPA's treatment of these provisions, believing them no longer to apply to one-hour ozone levels under the 2004 Rule. EPA responded that petitioners had misinterpreted the 2004 Rule and that rate-of-progress plans continue in force as "applicable requirements" based on the one-hour standard. Because there is no dispute here, we merely take note of EPA's interpretation of its rule. *See Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1033-34 (D.C. Cir. 1999).

**4.**

Contingency Plans. Each SIP must include "specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date." CAA § 172(c)(9), 42 U.S.C. § 7502(c)(9); *see* CAA § 182(c)(9), 42 U.S.C. § 7511a(c)(9) (contingency plans for Serious areas); *Sierra Club v. EPA*, 294 F.3d 155, 164 (D.C. Cir. 2002). EPA determined that "[w]here contingency measures have not yet been triggered, we believe it is consistent with Congressional intent to allow areas to remove those measures (or to modify the trigger for such measures to reflect the 8-hour standard)." 2004 Rule

Reconsideration, 70 Fed. Reg. at 30,599.

EPA can point to no aspect of Congress's approach that suggests that the one-hour ozone levels specifically addressed by statute can be allowed to deteriorate. Even if EPA had determined that ozone was not nearly as damaging as previously believed and that a level of 100 ppm was acceptable, section 172(e) would still require the automatic imposition of contingency measures if an area were to miss the preexisting threshold of 0.12 ppm. This is precisely the type of backsliding contemplated by the Act. As discussed with respect to penalties, EPA's emphasis on whether the controls have been "triggered" is a red herring. To conform to Congressional intent, one-hour contingency plans must remain in place even after transitioning away from the one-hour standard.

**5.**

Motor Vehicle Emissions Budgets. In enacting the 1990 Amendments, Congress was particularly concerned with pollution arising from automobile emissions. *See* S. REP. NO. 101-228, at 85-86, *reprinted in* 5 LEGISLATIVE HISTORY, *supra*, at 8425-26. As a result, it strengthened efforts to ensure that local transportation planning conforms to pollution controls in approved SIPs by adding section 176(c)(2)(A), 42 U.S.C. § 7506(c)(2)(A).[7] *See Envtl. Def. Fund v. EPA*, 167 F.3d 641,

---

[7] Section 176(c)(2)(A) provides that

> no transportation plan or transportation improvement program may be adopted by a metropolitan planning organization . . . or be found to be in conformity by a metropolitan planning organization until a final determination has been made that emissions expected from implementation of such plans and programs are consistent with estimates of emissions from motor vehicles and necessary emissions reductions

643-44 (D.C. Cir. 1999). Conformity, in turn, requires a finding that anticipated emissions will not frustrate a SIP's purpose nor contribute additional violations or delays in any area. CAA § 176(c)(1), 42 U.S.C. § 7506(c)(1). EPA implemented this mandate by establishing motor vehicle emissions budgets not to be exceeded by Metropolitan Planning Organizations. *See* 40 C.F.R. § 93.118.

In the 2004 Rule, EPA determined that "conformity determinations [would] no longer [be] required for the 1-hour NAAQS." 69 Fed. Reg. at 23,985; *see also* Transportation Conformity Rule Amendments for the New 8-Hour Ozone and PM$_{2.5}$ NAAQS, 69 Fed. Reg. 40,004, 40,009 (July 1, 2004) (hereinafter "Transportation Conformity Rule Amendments"). EPA acknowledged that "the majority of commenters that addressed this issue objected to EPA's proposal," 2004 Rule, 69 Fed. Reg. at 23,986, but concluded that the Act "specifically states that conformity applies only in" nonattainment and maintenance areas, *id.* at 23,987.

Although section 176 provides a floor above which conformity determinations are required, EPA cannot conclude that conformity using one-hour SIP emissions budgets is unnecessary without confronting section 172(e). Because one-hour conformity emissions budgets constitute "controls" under section 172(e), they remain "applicable requirements" that must be retained. EPA cannot well respond to commenters' concerns that removing one-hour SIP emissions budgets from conformity demonstrations would "allow large increases in motor vehicle emissions" by acknowledging that "requiring conformity for both ozone standards at the same time would be overly

---

contained in the applicable implementation plan.

42 U.S.C. § 7506(c)(2)(A).

burdensome and confusing." Transportation Conformity Rule Amendments, 69 Fed. Reg. at 40,009-10. EPA is required by statute to keep in place measures intended to constrain ozone levels—even the ones that apply to outdated standards—in order to prevent backsliding. This principle encompasses conformity based on one-hour SIP emissions budgets. *See* 40 C.F.R. § 93.109(e); *Envtl. Def. v. EPA*, 467 F.3d 1329 (D.C. Cir. 2006).

## VII.

Consistent with *Whitman* and the Act, we grant the State petition and the Environmental petition, except with respect to the withdrawal of the one-hour NAAQS; we also deny the Industry petitions and we dismiss the Ohio petition. Accordingly, we vacate those portions of the 2004 Rule that provide for regulation of eight-hour nonattainment areas under Subpart 1 in lieu of Subpart 2 and those portions of the 2004 Rule that allow backsliding with respect to the measures addressed in Parts VI.C.1 through VI.C.5 of this opinion, and remand the matter to EPA.